IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TRUSSWAY, LTD., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.: 4:06-CV-00219 |
| | § | |
| AJM FRAMERS, INC., JOHN WIGGS | § | **JURY TRIAL DEMANDED** |
| AND CONSTRUCTION RESOURCE | § | |
| SERVICES, INC., | § | |
| | § | |
| Defendants. | § | |

### PLAINTIFF'S SECOND AMENDED ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiff, Trussway, Ltd., and brings this action against Defendants AJM Framers, Inc., John Wiggs, and Construction Resource Services, Inc. (cumulatively "Defendants"), and in support thereof respectfully shows the court as follows:

### PARTIES

1.      Plaintiff, Trussway, Ltd. ("Trussway") is a Texas limited partnership, with its principal place of business in Houston, Texas.

2      Defendant, AJM Framers, Inc. ("AJM"), a Texas corporation whose registered office is 16850 Diana Lane Ste. 102, Houston, Texas 77058, Harris County, Texas, has already appeared and answered in this suit, and no further service is necessary.  AJM and Trussway have tentatively agreed that Trussway will dismiss its claims against AJM only, and the terms and conditions of the stipulation and dismissal are being drafted and expect to be submitted in the near future.

3.      Defendant, John Wiggs ("Wiggs" or "John Wiggs"), an individual, who is a citizen of the State of Texas residing at #18 Ellis Rd., League City, Texas 77573

1



Galveston County, Texas. Wiggs has appeared and answered; no further service is necessary.

4.     Defendant, Construction Resource Services, Inc. ("CRS"), is a corporation organized and existing under the laws of the State of Florida, whose principal office is located at 5000 U.S. Highway 17, Suite 18, #301, Orange Park, Florida 32003, Clay County, State of Florida.  CRS has appeared and answered; no further service is necessary.

## JURISDICTION

5.     This Court has federal question jurisdiction in this matter under 28 U.S.C. §1331 because this litigation involves, among other things, claims asserted under the Lanham Act, 15 U.S.C. §1114.et seq.

## CONDITIONS PRECEDENT

6.     All conditions precedent have been performed or have occurred.

## FACTS

7.     Trussway has been in the business of truss design and manufacturing, itself and through predecessors since 1971. Over the years Trussway has developed and acquired by license various proprietary software, engineering models, and templates, including but not limited to: (a) the licensed MiTek, Inc. ("MiTek") engineering software exclusively available to MiTek truss fabricators such as Trussway; and (b) AutoCad software, including customization by Trussway regarding models, templates and printout criteria, including fonts, line thicknesses, color scheme, construction notes and warnings, etc., developed by Trussway to quickly convey key information to the user such as construction framers, general contractors, project engineers, developers and owners, and relevant authorities such as the City of Houston (cumulatively,

"Trussway Engineering"). Trussway Engineering is well known as proprietary to Trussway and establishes a level of engineering quality and consistency unmatched in the industry.

8. Trussway operates sales, design and engineering centers, and manufacturing facilities in numerous locations throughout the United States. Rick Ignelzi ("Ignelzi"), the current president of CRS, was an employee of Trussway for many years, served as the President of Trussway for several years, and ended his employment by Trussway under adverse circumstances in early 2002. Wiggs was a senior salesman for Trussway for many years and was a friend and close business associate of Ignelzi. Wiggs was a very successful salesman with Trussway for more than 25 years, and was a former shareholder/employee of Trussway, who previously sold his ownership in Trussway for several million dollars in exchange for a Non-Disclosure, Non-Competition, and Non-Solicitation Agreement ("Wiggs Agreement"). The Wiggs Agreement required that Wiggs honor certain non-competition and non-solicitation provisions for the one year period after his employment terminated. [1]

9. Wiggs resigned from Trussway on October 6, 2004, meaning that he was bound not to compete or interfere with Trussway's business through October 6, 2005. Not coincidentally, Ignelzi formed defendant CRS, a Florida corporation on October 24, 2004, less than three weeks after Wiggs left Trussway. Prior to Wiggs resigning from Trussway, Wiggs had been in charge of a large number of bids and projects under consideration by Trussway; but for the approximate six months before Wiggs left

---

[1] The Wiggs Agreement specifically identifies a broad range of proprietary and confidential information which Wiggs is prevented from using after the termination of his employment, including any misuse of software programs, as well as restricting his ability to engage in the Business of Trussway for the one year period after his termination, as well as a provision prohibiting his solicitation or encouragement of other employees of Trussway to leave Trussway. Wiggs has blatantly violated each of those provisions, acting in concert with Ignelzi/CRS.

Trussway, Wiggs had insisted that Trussway reassign such accounts to Wiggs' son, Chris Wiggs, who also worked as a salesman at Trussway, based in part on John Wigg's alleged desire to move into more of a management/consulting position with Trussway. John Wiggs and Chris Wiggs had available to them Trussway's critical and largely confidential information for projects, including but not limited to bid data, cost modeling, customer needs/requirements, pricing, preliminary engineering issues, etc. Again following in his father's footsteps, Chris Wiggs resigned from Trussway in the summer of 2005. Chris Wiggs had not executed any non-competition agreement with Trussway; but Trussway contends that the misuse of its proprietary and/or confidential information is actionable.

10. Upon information and belief, John Wiggs joined with CRS (founded by Wiggs' friend Ignelzi) and to some extent with Chris Wiggs to divert business away from Trussway during the period of John Wiggs' one year non-compete/non-solicitation agreement, attempting to avoid, however, Trussway's discovery of his efforts. While John Wiggs' activities in the first few months after his resignation from Trussway appeared low key, Trussway contends that Wiggs joined with CRS (acting on behalf of, in concert with, and as an agent for CRS) during the one year non-compete/non-solicitation period to essentially setup a truss sales/engineering/consultation business in the form of CRS, which is intended to accumulate orders from customers based on the promise of value engineering and other design by the Wiggs/CRS team, and then subcontract the actual fabrication of the trusses to the lowest fabrication bidder – in blatant breach of the Wiggs Agreement. Moreover, Wiggs undertook these activities with full knowledge of countless projects in the proverbial "pipeline" at Trussway.

4

Trussway contends that it has lost business and is likely to lose future business as a result of the Wiggs/CRS's activities outlined in this Complaint.

11. Trussway first uncovered Wiggs' illicit activities by visiting a new construction project known as the Estates of Greenway ("Greenway Project") in November, 2005. At that time Trussway discovered that the Greenway Project was being built with plans and drawings not only utilizing Trussway Engineering, but also Trussway's name boldly implanted on such plans and drawings. Greg Frey, Operations Manager for Trussway's Houston Division was shocked at this discovery because he knew that Trussway had not sold the trusses being delivered to the Greenway Project. The Greenway Project was being framed by one of the defendants, AJM, and AJM readily admitted to using the drawings with Trussway's name and Trussway Engineering. In fact, it is apparently undisputed that most of the people involved in the construction at the Greenway Project believed that Trussway supplied the engineering, the drawings and was fabricating and furnishing the trusses. As later discovered by Trussway, however, these truss designs and plans were furnished by John Wiggs and CRS, acting in concert with one another and in concert with several other then current and now former employees of Trussway, utilizing pirated versions of Trussway's proprietary information including but not limited to Trussway's Engineering. Moreover, Trussway learned that John Wiggs/CRS had worked with American Truss Systems, Inc. ("American Truss"), a competitor to Trussway located in Houston, Texas, to actually fabricate and furnish the trusses for the Greenway Project. In fact American Truss built trusses and components for the Greenway Project per the Trussway Engineering, although they failed miserably to fabricate to conform with the Trussway Engineering.

5

12.    While Trussway was very concerned about the illicit activities of Wiggs and CRS and did not intend its earlier pleadings in this matter to suggest a lack of interest in pursuing Wiggs and CRS for damages and for a permanent injunction, Trussway's first concern upon visiting the Greenway Project was that the engineering was (a) alleged to be Trussway Engineering, yet (b) improper and erroneous, and (c) the fabrication using substitute components was in blatant violation of the Trussway Engineering standards and the MiTek license and engineering assumptions.    More specifically, Trussway engineering is based on MiTek Software[2] under license to Trussway, with Trussway's customization, engineering assumptions, and modeling as noted above, as well as the Trussway templates that have been developed, all of which is based on the fundamental assumption that MiTek manufactured metal connector plates will be used to build trusses per such designs.  During Greg Frey's visit to the Greenway Project he determined that while the design was Trussway/Mitek, the trusses lacked identification as to the fabricator and the connector plates were clearly not manufactured by MiTek.  The failure to utilize the connector plates called for by the engineering software violated engineering standards and rendered the entire Greenway Project in violation of proper engineering standards, City of Houston standards, and potentially dangerous.

13.    As a result of such misappropriation and misuse of the pirated intellectual property of Trussway, Trussway initially pursued the entity in possession of such pirated

---

[2]  MiTek is one of the predominant truss plate manufacturers in the United States, and supplies patented metal connector plates.  Metal connector plates are a fundamental component of all trusses. The plates are pressed by manufacturers into joints where various wood components connect, and the teeth of the plates hold the wood in place and provide other values essential to the strength and safety of the fabricated wood truss.  Because of its desire to sell metal plates to the truss industry, MiTek also allows its authorized truss fabricators under a separate license to utilize the MiTek truss design software under the strict controls placed by MiTek.  Also, over many years Trussway has developed certain parameters and assumptions, including safety factors, etc. which make its truss designs consistent and conforming to its quality standards.

intellectual property (i.e. AJM) because AJM was using the Trussway plans to build the Greenway Project, yet they were doing it with inferior trusses which did not conform to the drawings bearing the Trussway name; and Trussway believed that the Trussway drawings, based on pirated software, likely contained engineering errors, which has subsequently been determined as an accurate prediction with discoveries of one serious error after another.

14.    Trussway filed suit against AJM, sought to enjoin further efforts to build the Greenway Project under these circumstances, and attempted to enlist the assistance of the engineers of record, SCA Engineering Consultants ("SCA"), and the developer/general contractor, Morgan Construction Company ("Morgan").  As might be expected, the initial reaction by AJM, SCA and Morgan was somewhat disbelief.  After eventually learning of the nature and extent of the misuse of Trussway's engineering, and, more importantly, the failure to use the engineering properly and the fabrication of trusses by American Truss, under direction from Wiggs/CRS, which did not meet necessary engineering standards and wasn't even close to meeting the Trussway Engineering standards, AJM, SCA and Morgan undertook to correct the problems.

15.    In fact, upon learning that the trusses being supplied by American Truss were not fabricated by Trussway and did not come close to meeting the Trussway standards as represented by Wiggs/CRS to AJM, to SCA and to Morgan, Trussway was awarded the remaining portion of the Greenway Project because that is the standard that Morgan wanted and thought it was receiving.  However, Trussway lost over $500,000 in business which Trussway likely would have received had the truth as to Wiggs/CRS misuse of Trussway's engineering, failed engineering, and improper

7

fabrication of trusses by American Truss been disclosed to AJM, SCA and to Morgan early in the Greenway Project.

16.    To facilitate Wiggs/CRS' effort to misappropriate Trussway's Engineering, Wiggs/CRS not only misused the software, misappropriated the templates and engineering modeling, and stole Trussway's name, but also Wiggs/CRS intentionally interfered with Trussway's existing employees at a time when such employees were still working for Trussway, by encouraging them to misuse the software both during their employment and after their employment at Trussway.   Trussway believes that this occurred not only on the Greenway Project but also on other projects that at this moment have not yet been determined, but through discovery will be uncovered. Further, at all times relevant to this suit, Wiggs has been acting on behalf of, in concert with, and as an agent for CRS.

17.    Even at this very early stage of this lawsuit, Trussway's investigation has nonetheless revealed that:

(a)    Wiggs resigned from Trussway on October 6, 2004, for the purpose of teaming up with Rick Ignelzi who formed Construction Resource Services, Inc. on October 24, 2004. (See also the Affidavit of Gary Gage, attached as Exhibit "A" which supports this contention, as well as other information gathered by Trussway) CRS was formed with the intention of diverting the control of business from Trussway to CRS/Wiggs/Ignelzi, who will then provide its own "value engineering" (utilizing Trussway's Engineering for as long as they could) taking most of the profit and then attempt to "broker" trusses to the cheapest fabricator.

(b)    John Wiggs' son, Chris Wiggs, appears to be a great source of coordinating information between John Wiggs, Chih Wei Yin (a former Trussway designer) and Gary Gage (another former Trussway designer).  Upon information and belief, Chris Wiggs has assisted his father, John Wiggs, in an effort to divert customers and employees away from Trussway, though the extent of his involvement is unknown at this time.

(c)    John Wiggs approached AJM in the late spring/early summer of 2005 regarding Wiggs' and CRS's desire to "add value" to the Greenway Project by providing their consulting services as an intermediary and then using their connections and expertise to obtain cheaper trusses, earning a fee for their

effort, causing AJM to believe that it would receive engineering and trusses based on the Trussway Engineering standards, through misuse of Trussway's proprietary and confidential information.

(d)     Upon information and belief, John Wiggs had previous to the Greenway Project diverted other work away from Trussway and otherwise violated the Wiggs Agreement, including but not limited to an Erickson built project located in Houston, Texas which Trussway should have received had Wiggs not violated the Wiggs Agreement.  In fact, Wiggs was discovered to have helped American Truss complete this project and upon information and belief was instrumental in diverting this and other work away from Trussway in an effort to setup his independent, value added, engineering/ brokering business in conjunction with Ignelzi/CRS.

(e)     While Wiggs knew that neither he nor Ignelzi/CRS held legitimate licenses or software engineering expertise to perform the promised design/engineering services on the Greenway Project (& likely other projects), Wiggs and Ignelzi maintained relationships with other Trussway employees (both current at that time and  former) who did possess such expertise.

(f)     Wiggs turned to Raju Srirama ("Srirama"), a former Trussway designer who had unfortunately and unknown to Trussway retained a copy of Trussway's proprietary truss design and truss CAD layout ("Truss Layout") software  on his personal computer after leaving Trussway.

(g)     Srirama had also retained on his personal computer a copy of Trussway's proprietary, licensed individual truss engineering/modeling software under license from MiTek, Inc. which allowed Srirama to create drawings or cut sheets for the fabrication of individual trusses based on such software ("Truss Cut Sheets") (Truss Layout and Truss Cut Sheet related software being hereinafter defined cumulatively as the "Software" unless specified otherwise).

(h)     Wiggs first approached Srirama by surprising Srirama during an ostensible "lunch" to misuse his copy of Trussway's Software for Wigg's purposes, but Srirama agreed to use such Software on the condition that Wiggs could somehow obtain a license and/or authorization from someone to use such Software.

(i)     Wiggs convinced Srirama to start work immediately because any delays would damage the Greenway Project, and that he would obtain such authorization later.  Later never came, despite numerous requests by Srirama to Wiggs for such authorization, at which point Wiggs enlisted the personal efforts of Ignelzi, one of the owners of CRS, to convince Srirama to keep working on the design/engineering through continued misuse of Trussway's Software, arguing with both the carrot (paying money to Srirama) and the stick (the Greenway Project was under strict deadlines) to convince Srirama to keep working. Ultimately Srirama refused to finish the design/engineering for the Greenway Project because he knew it was wrong, whereupon CRS paid Srirama for his

9

work, approximately in the amount of $2,000.00 (Srirama's affidavit is on point as to the wrongful nature of this misuse and how Wiggs and Ignelzi knew that it was wrong, attached as Exhibit "B" hereto).

(j)     Wiggs also approached another Trussway employee, Chih Wei Yin ("Yin"), at a time when Yin still worked for Trussway.  In fact, it has recently been discovered that Yin, Ignelzi and Wiggs have been working on this "plan" for a long time, but because of the significant income that Yin was receiving as a truss designer at Trussway he was not anxious to quit until the new Wiggs/CRS business was setup and running.  Thus Yin remained employed by Trussway until notifying Trussway of his resignation on October 20, 2005.  In direct violation of the Wiggs Agreement, John Wiggs solicited and encouraged Yin to leave Trussway's employment, which Yin eventually did on October 20, 2005.  Yin and Trussway had enjoyed a long and mutually advantageous relationship prior to Yin's resignation.

(k)     However, worse than just encouraging Yin to quit Trussway, Wiggs/CRS/Ignelzi actually encouraged Yin to perform a portion of the truss design/engineering work for the Greenway Project while Yin was still employed by Trussway and working at Trussway's office in Houston.  In fact, Trussway now has copies of drawing submittals with Yin's name on such submittals and computer files have been discovered on Trussway's central computer system proving that Yin did much of the truss design/engineering work for the Greenway Project while on payroll at Trussway, unknown to Trussway until recently.   Yin reported to Trussway that he was resigning to help a sick family members manage a restaurant, not to assist Wiggs/CRS in their new business; and certainly did not disclose that he had already performed design/engineering work at his Trussway office utilizing Trussway's software, modeling data, etc., and on Trussway time.

(l)     Trussway previously learned of only a portion of Yin's involvement and truly wanted to avoid conflict with Yin.  Therefore, Trussway offered not to name Yin as a defendant in any lawsuit if Yin would voluntarily tell the whole truth, turnover his pirated software, and agree not to misuse Trussway's rights in the future. As a result, Yin submitted an affidavit, which is only partially true and fails to disclose his involvement in the Greenway Project while still employed by Trussway and also intentionally failed to disclose his involvement with Gary Gage, another former Trussway employee who misused Trussway's software in order to assist Wiggs/CRS and Yin on the Greenway Project.   Trussway contends that Yin's acts and ommissions as it relates to this case were committed on behalf of, and as an agent for Wiggs/CRS.

(m)     Interestingly, Gage was offered a similar arrangement whereby Trussway would not name him as a defendant if he cooperated and gave a truthful statement, which he did in the form of his affidavit attached hereto.  Gage has sworn via his affidavit that Yin left Trussway to work with John Wiggs, Rick Ignelzi and Construction Resource Services, based in part on promises by Wiggs and Ignelzi that they could give him enough work to keep him busy (par.6,

affidavit of Gage, Exhibit A). Gage has also stated that Wiggs and Yin convinced him to use Trussway's MiTek software and AutoCad even though he knew it was wrong and Wiggs knew that it was wrong.

(n)     Significantly, Gage has sworn that Yin met with John Wiggs on a regular basis in September, October and November, 2005 (keeping in mind that Yin did not resign from Trussway until October 20, 2005), but that after the lawsuit was filed "**[Yin] and [Gage] discussed the lawsuit and he . . . told me that I should destroy all documents and all electronic files related to this matter. I did as he suggested and even de-fragmented my hard drive so that I would not have any electronic files relating to this matter." (Affidavit of Gary Gage, Par.11, Exhibit "A")**

(o)     Upon information and belief, Yin, Wiggs and Ignelzi/CRS have conspired to prevent discovery, including the instruction that Gage should destroy documents and all electronic files as noted above.

(p)     Wiggs also knew that the Greenway Project required "sealed" drawings, meaning that a licensed engineer must "seal" such drawings, so Wiggs approached Chris Newhouse, P.E. ("Newhouse"), another former Trussway employee. Newhouse also had a copy of MiTek software on his computer under sponsorship by Trussway, limited to assisting Trussway or other legitimate MiTek engineers/fabricators—and Wiggs requested that Newhouse place his engineering seal on the work initiated by Srirama and finished by Yin. Newhouse also sealed component designs prepared by Yin while he was employed by Trussway and truss designs prepared by Gage while he was employed by yet another competitor of Trussway, Scholl Forest Products.

(q)     Newhouse's precise role in this nefarious affair is not entirely known, except that his "seal" appears on various drawings and through telephonic and personal interview has stated that based on his communications with Wiggs and others he thought that the Greenway Project was for Trussway and that he was within his license to seal such drawings through use of the MiTek software license. Newhouse appeared willing to turnover documents and voluntarily make a statement, but for unknown reasons (suspicions are interference by defendants) he declined to provide further information or copies of engineering backup, etc. based on an engineering statute that prevents disclosure without the consent of the client. Since his client now appears to be someone other than Trussway, Newhouse has been unable to cooperate or provide information, and Trussway presumes that one or more of the defendants have convinced Newhouse not to provide such information.

(r)     Before apparently learning that this Greenway Project was not for Trussway, Newhouse has stated via a telephone interview that he did not prepare the truss design drawings, but merely sealed the drawings already prepared by Srirama, that Newhouse was asked "after the fact" to issue a letter opining that the trusses "as-built" with substitute Eagle Metal brand and Truswal brand plates were acceptable, that Newhouse issued such a letter based on his

11

belief that the substitute plates held only a 7% lesser value than the MiTek plates, and that because this was based on Trussway Engineering which always added an extra 15% safety factor, he was "comfortable" with the substitutions. Again, Newhouse appears to have issued such statements and opinions based on his understanding that this project was for Trussway and that the underlying engineering was pursuant to the Trussway 15% safety factor. It appears that Newhouse was not the only person misled by the Wiggs/CRS team.

(s) Trussway has not had the opportunity for any formal discovery and its investigation to date has largely consisted of confronting witnesses with the information already known to or surmised by Trussway. It is believed, however, that Wiggs and CRS, perhaps with the assistance of others, have diverted other work destined for Trussway and otherwise harmed Trussway's position in the marketplace.

18.     As can be gleaned from the above factual chronology, Defendants have taken extraordinary measures to misappropriate and to misuse such misappropriated Software and other intellectual property of Trussway, wreaking havoc on a host of individuals and companies – all in the interest of squeezing a profit by trading off from the intellectual property of Trussway.    Trussway's necessary actions to protect itself on the Greenway Project required revelation of these problems to Morgan and to SCA, both such companies having had very good business relationships with Trussway for many years. Understandably, they were not pleased to learn about all of this, and every indication suggests that they are taking quick, affirmative steps to correct the problems revealed by Trussway's discovery.   As in the proverbial phrase, "Don't shoot the messenger," however, Trussway is in the awkward position of forcing these revelations, for its own protection as well as those with whom it is involved, and perhaps of future tenants of this Greenway Project, yet unknown.

19.     Rather than admitting their misdeeds, adding insult and more injury to injury--Defendants and especially Wiggs, are apparently attempting to blame Trussway for such revelations, thereby disparaging Trussway's reputation to all who will listen. Trussway seeks a final judgment in this matter which will demonstrate that Trussway is

12

not just upset about Wiggs' decision to leave — as Wiggs is trying to portray this sorry experience — but unwilling to allow employees to engage in the kind of conduct that Wiggs and CRS/Ignelzi have undertaken since Wiggs left in October, 2004.

20.     Trussway does not know how much it lost at this point nor does Trussway know how much Wiggs, CRS/Ignelzi and perhaps others such as Yin and American Truss gained from the illicit activities complained of herein. Trussway knows that it lost $500,000 in sales on the Greenway Project which could have been received but for the bad conduct of Wiggs and CRS, if only Wiggs/CRS had disclosed the full truth to Morgan, SCA, AJM and to Newhouse — as opposed to trying to trade off from the name, engineering standards, and pirated software and other intellectual property of Trussway. Trussway contends that it lost many other projects and suffered unfair competition and continues to suffer damage to its reputation which damage is ongoing as a result of the Wiggs/CRS' "spin" on the merits of this lawsuit. Trussway seeks damages and believes that a permanent injunction preventing Wiggs/CRS from misusing its confidential information and/or damages for same, and a final judgment adjudicating the Wiggs/CRS illicit conduct as precisely that: illicit and wrongful, is necessary and provided by the various causes of action pled in this matter. Trussway has also been damaged due to Wiggs' unlawful diverting of projects away from Trussway during the period of his non-compete/non-solicitation agreement with Trussway.

## CAUSES OF ACTION

### Count 1 – False Designation, False Description Under the Lanham Act

21.     Defendants' unauthorized use of the name and mark "Trussway" on the truss placement plans, misuse of Trussway's engineering standards for output such as font, color coding, line sizing, engineering notes, references and other output on the

drawings, and use of the MiTek name and engineering in connection with Trussway on the individual engineering cut sheets, combined with other internal data showing a misuse of Trussway's engineering criteria, falsely indicates to consumers that Defendants' products and/or services originate from, are approved by, are sponsored by, are licensed by, or are affiliated with Trussway or are otherwise associated with Plaintiff's products and/or services. At a minimum, even the engineer who sealed the drawings (Chris Newhouse) believed that the underlying engineering was based on the Trussway standard 15% extra safety factor, making such engineering and trusses fabricated pursuant to such engineering comparable with Trussway's engineering and fabrication. It was not. In fact, the drawings, submittals and other materials promoted or advertised by Defendants' caused the users (AJM, Morgan, SCA, and ultimately the owners and occupants of this multifamily project) to believe that the engineering work and the trusses being provided by Defendants were of a quality similar to Trussway. Again, this representation was knowingly false when made, and was willfully made for the very purpose of misleading such users/consumers into believing that they were either acquiring Trussway engineering and products or at a minimum some of the users/consumers believed that they were acquiring goods and services equal to the Trussway standard. Again, this was a blatantly and intentionally false representation

22. Defendants' actions, including those of their agents, Yin among others, as set forth above, constitute false descriptions and false designations, false advertising and false promotion, of the origin, sponsorship, nature, characteristics, and qualities of the proffered goods and services involving commercial activities. Trussway has been damaged by the Greenway Project through loss of the initial order, has suffered damage to its reputation, and upon information and belief has lost other projects and

other work to Defendants and/or others acting in concert with Trussway, all of which is in violation of the Lanham Act, 15 U.S.C. § 1125(a). The willful and malicious conduct which is the subject of this Complaint entitles Trussway to treble its actual damages, and/or an accounting for profits and disgorgement of same by Defendants and those acting in concert with Defendants, as well as an award of attorney fees under 15 U.S.C. § 1117(a).

## Count 2 – Common Law (& Texas Statutory) Infringement & Unfair Competition

23.     Defendants' unauthorized use of the name and mark "Trussway" on the truss placement plans, misuse of Trussway's engineering standards for output such as font, color coding, line sizing, engineering notes, references and other output on the drawings, and use of the MiTek name and engineering in connection with Trussway on the individual engineering cut sheets, combined with other internal data showing a misuse of Trussway's engineering criteria, falsely indicates to consumers that Defendants' products and/or services originate from, are approved by, are sponsored by, are licensed by, or are affiliated with Trussway or are otherwise associated with Plaintiff's products and/or services. These actions violate Trussway's trademark and/or service mark and/or trade name rights. The Trussway mark has been used in connection with its fabrication of goods and engineering services for over thirty years, and is eligible for full trademark/servicemark protection.

24.     Defendants' actions, including those of their agents, Yin among others, and those acting in concert with Defendants, as set forth above, constitute common law trademark infringement entitling Trussway to its actual damages and/or to an accounting for the profits realized by Defendants. Defendants' unauthorized use of the name and mark "Trussway" unjustly enriches them at the expense of Trussway's

15

reputation and goodwill, while at the same time endangering the public health and welfare. Such conduct also constitutes Unfair Competition entitling Trussway to additional damages and attorney fees for violations of Section 16.29 of the Texas Business and Commerce Code.

## Count 3 – Trade-Secret/Proprietary Property Misappropriation

25.     Trussway owns the intellectual property and other proprietary information as set forth above, including among other things: computer programs and software with licenses to Trussway, product designs and manufacturing information, and technical information and drawings, which have been misused by former employees of Trussway, including Wiggs, for the benefit of Defendants; some of which was even misused by an existing employee of Trussway (Chih Wei Yin) at the time Yin was employed by Trussway and utilizing Trussway's proprietary information and licensed software for the benefit of and as an agent for Defendants Wiggs and CRS and to the detriment of Trussway. The simple fact is that American Truss could not have engineered and/or fabricated a project of the size and nature of the Greenway Project without the assistance of someone like Wiggs/CRS and Trussway's employee, Yin. Thus, Wiggs/CRS enabled American Truss to bid and attempt to deliver the Greenway Project; and upon information and belief Wiggs/CRS was instrumental in causing Trussway to lose other work and projects which would have come to Trussway but for the wrongful conduct. Defendants' conduct, including the conduct of their agents, Yin among others, violates Trussway's license for its engineering software, deprives Trussway of its intellectual property without just compensation, tortiously interferes with Trussway's contractual relations, creates lost profits, good will, and customers for Trussway, and creates a great deal of exposure to potential liability.

## Count 4 – Tortious Interference with an Existing Contract

26. Trussway had a valid written contract with John Wiggs and had employment agreements, implicit and explicit, with the other employees of Trussway which prohibited the misuse of Trussway's intellectual property, including the misuse of its computers, CAD programs, data bases, templates, and, most importantly, its license from MiTek to use the MiTek software. Wiggs and CRS knew of these relationships (as the former President Ignelzi had presided over such policies and Wiggs executed the Wiggs Agreement specifying the confidentiality and proprietary nature of such relationships and information), yet Wiggs and CRS worked with and encouraged the Trussway employees to breach their agreements and their obligations to Trussway not to misuse Trussway's intellectual property for the benefit of Wiggs and CRS. Similarly, Wiggs strongly encouraged Srirama, Yin and Gage to breach their obligations to Trussway. In fact, Wiggs and CRS encouraged Yin to breach his obligations to Trussway while still on Trussway's payroll and at Yin's desk at Trussway and utilizing Trussway's computers, other hardware, and the software and other programs noted above.

27. As such, Trussway is entitled to actual damages as proven at trial, as well as exemplary damages.

## Count 5 – Breach of Contract: Wiggs

28. As described above, Trussway had a valid written contract with John Wiggs (defined above as the "Wiggs Agreement"). Wiggs breached the contract in

17

numerous ways as described above, and Plaintiff Trussway sues for all damages proximately caused thereby, including attorney fees and costs.

### Count 6 – Conversion

29.     As described above, Defendants and their agents have converted the intellectual property of Trussway to the use and benefit of themselves.

30.     As such, Trussway is entitled to all recoverable damages for conversion, including but no limited to, actual damages as proven at trial, as well as exemplary damages and reasonable and necessary attorney fees.

### Count 7 – Conspiracy

31.     The Defendants Wiggs and CRS conspired with each other and with Yin and presumably with American Truss to accomplish the aforementioned acts and purposes, whose object was either to achieve an unlawful purpose or to achieve a lawful purpose by unlawful means. The Defendants had a meeting of the minds on the object or course of action, and at least one defendant committed an overt act to further that object or course of action. As a proximate result of these wrongful acts, Plaintiff suffered injuries and is likely to continue to suffer injuries.

### REQUEST FOR PERMANENT INJUNCTION

32.     Plaintiff, Trussway, asks the court to hold a full trial on the issues raised in this complaint, and, after trial, issue a permanent injunction against the Defendants. Plaintiff seeks a permanent injunction barring Defendants from infringing on Plaintiff's trade name and mark, from using Plaintiff's intellectual property, including software, computers, licenses, or templates without authority, and from anyway suggesting or implying to the public that its products and/or services are in any way related to

18

Trussway. Plaintiff seeks this remedy pursuant to its common law and equitable rights, as well as under the authority granted to this court by 15 U.S.C. §1116(a).

## DEMAND FOR JURY TRIAL

33. Plaintiff, Trussway, LTD, asserts its rights under the Seventh Amendment to the U.S. Constitution and demands, in accordance with Federal Rule of Civil Procedure 38, a trial by jury on all issues.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff, Trussway prays that this court:

a. award judgment for all recoverable damages, including but not limited to, actual damages as proven at trial;

b. award for disgorgement of profits derived from the illicit conduct of Defendants and their co-conspirators;

c. award judgment for treble damages as proven at trial;

d. issue a permanent injunction against defendant as described herein;

e. award exemplary damages;

f. award judgment for prejudgment interest as allowed by law;

g. award recovery of reasonable and necessary attorney fees;

h. award post-judgment interest on any judgment that might be entered; and

i. for all other relief to which Plaintiff Trussway may be entitled.

Respectfully submitted,

PAGEL, DAVIS & HILL, P.C.

   /s/   Martyn B. Hill
Martyn B. Hill
State Bar No: 09647460
Michael A. Harris
State Bar No. 24046030
1415 Louisiana, 22nd Floor
Houston, Texas 77002
Telephone:   713-951-0160
Facsimile:   713-951-0662

**ATTORNEY FOR PLAINTIFF
TRUSSWAY LTD.**

## **CERTIFICATE OF SERVICE**

This is to certify that on the 13th day of October, 2006, a true and correct copy of this Second Amended Complaint was served upon:

Earle S. Lilly
Piro, Lilly & Cole                              Certified Mail, Return Receipt Requested
1400 Post Oak Blvd., Suite 600
Houston, Texas 77056-3008
COUNSEL FOR AJM FRAMERS, INC.

Wayne A. Risoli
Steven J. Knight                               Certified Mail, Return Receipt Requested
Chamberlain, Hrdlicka, White
    Williams & Martin
1200 Smith Street, Suite 1400
Houston, Texas 77002
COUNSEL FOR DEFENDANT CRS

Andrew Golub
Geoffrey A. Berg                               Certified Mail, Return Receipt Requested
Dow, Golub, Berg & Beverly, LLP
8 Greenway Plaza, 14th Floor
Houston, Texas 77046
COUNSEL FOR DEFENDANT WIGGS


                                      /s/   Martyn B. Hill
                                      Martyn B. Hill


S:\PDH Files\Active\TRUSL1\TRUSL1L-Litigation\Wiggs Litig\DRA\PLD0COM20061013.Second Amended
Complaint.final.doc

21

## AFFIDAVIT OF CLIFFORD GARRETT (GARY) GAGE

STATE OF TEXAS      §
                             §

COUNTY OF HARRIS    §

On this day, **CLIFFORD GARRETT (GARY) GAGE** appeared before me, the undersigned notary public, who upon his oath stated the following:

1.      "My name is Clifford Garrett Gage, though I commonly go by the name, "Gary". I am more than 21 years of age, of sound mind, and capable of making this affidavit. I have personal knowledge of the facts stated herein and do swear that they are true and correct.

2.      I worked for Trussway until August, 2005 when I left to go to work for Scholl Forest Products.

3.      Approximately two weeks later I was contacted by John Wiggs who advised that he needed assistance in completing the roof truss design work regarding the Estates of Greenway Project (the "Project"). I understood that he needed my assistance at that time because Raju Srirama had for whatever reason not completed the work and there was too much work in too short of a time period for all of the design work to be completed by Chih Wei Yin who was taking over the floor trusses and other truss design and layout work which was required by the Project.

4.      The only way I had of completing this design work was to utilize Trussway's licensed software from MiTek and Trussway's licensed AutoCad software. I knew that it was wrong to use this for non-Trussway work and without Trussway's approval, and there is not doubt in my mind that John Wiggs also knew that it was wrong – though we did not

1



EXHIBIT

A

discuss it in detail.

5.      John Wiggs simply needed the truss design work completed quickly in order to meet tight time deadlines, and Wei Yin couldn't get all of the work done within the required time frame. I understood that Wei Yin was working on several other projects with John Wiggs, Rick Ignelzi and their company, Construction Resource Services, Inc., though I do not recall the names of these projects. I do recall that Wei said that he was also working on several Trammel Crow projects (Alexan 288 & Alexan Stafford – Phase 2) for John Wiggs and Construction Resource Services, Inc., but I do not know whether any designs were made by Wei Yin using MiTek software.

6.      I also know that Wei Yin eventually left Trussway in order to work with John Wiggs, Rick Ignelzi and Construction Resource Services, Inc., though I do not know the details of that arrangement. I asked Wei Yin if he thought that John Wiggs and Rick Ignelzi could keep him busy enough, and he indicated that he believed that they could deliver enough work to keep him busy.

7.      When I first started my work I received a CD from John Wiggs with the architectural drawings and with Raju Srirami's preliminary work. This CD contained files with Trussway's templates and name on such files. I finished the Roof Truss drawings and submitted them to either Chris Newhouse and/or to John Wiggs. SCA Engineers reviewed and raised several rejections; so after Wei Yin brought me the necessary changes I made the revisions and resubmitted the package of drawings to Wei Yin. Again, I utilized Trussway's MiTek software license and Trussway's AutoCad software to complete this work.

8.      At some point Wei Yin and I discussed the fact that he needed legitimate

2

truss design software, so I got the MiTek telephone number from Chris Newhouse and called Norm McKenna at MiTek. I never told Chris Newhouse why I wanted the phone number. I am aware through communications by Wei Yin that he and John Wiggs met on a regular basis toward the end of September, 2005 through October and November of 2005, but I'm not certain of their communications regarding the terms of the acquisition of the MiTek software. Thus, I simply told Norm that I was working with a potential partner in Florida who needed a copy of the MiTek software and inquired about the possibility of obtaining such a copy, but he refused to license the software to a non-manufacturer. I also called Robbins regarding their software, but Robbins also refused to license non-manufacturers. If I had been successful I assumed that Wei Yin would be given the copy, though I wasn't sure whether he, Rick Ignelzi, Construction Resource Services, Inc., or John Wiggs would actually own the software. None of the people involved asked that I inquire about obtaining legitimate software, but after these unsuccessful telephone calls I shared the outcome with Wei Yin. Wei Yin simply indicated his appreciation for my efforts.

9.     As noted above, I knew that John Wiggs had teamed up with Rick Ignelzi and has a business relationship with Construction Resource Services, Inc., though I do not know the details of that relationship. I also know that Wei Yin left Trussway with the intent of working with John Wiggs, Construction Resource Services, Inc., and Ignelzi, though, again, I do not know the precise details of that relationship.

10.     Wei Yin delivered a check to me for my work on this Project in the amount of $2,500.00. I do not recall whose name appeared on the check, but I have promised to promptly provide a copy of this check to Trussway as soon as possible, if possible.

11.     After Trussway filed its lawsuit Wei Yin and I discussed the lawsuit and he

3

said that he would try not to mention my name to Trussway and would try to keep me out of any lawsuit. He told me that I should destroy all documents and all electronic files related to this matter. I did as he suggested and even de-fragmented my hard drive so that I would not have any electronic files relating to this matter.

12. Trussway has offered not to sue me if I tell them the complete truth and cooperate through voluntarily providing this affidavit. I did not want to say anything adverse to any of the people involved in this Project, especially my friends Wei Yin or Chris Wiggs, but I decided that this was the best thing to do. I discussed it with Wei Yin who told me to do what I had to do. In considering this issue I advised Trussway that I was considering contacting an attorney, and Trussway agreed that contacting my own lawyer would be a good idea. I have since contacted an attorney and after discussing the matter decided to make this statement and affidavit of my own free will. Trussway has also told me that while they want the truth, they want only the truth, nothing more. I was not pressured in any manner to say anything false whatsoever. In fact, as noted above, I was told to only tell the truth. We made multiple revisions to this affidavit and after my repeated review of its contents to assure the accuracy of this affidavit, I executed same as my truthful and sworn statement.

Further Affiant saith not."



CLIFFORD GARRETT (GARY) GAGE

SWORN TO and SUBSCRIBED before me by CLIFFORD GARRETT (GARY) GAGE on the 16th day of February, 2006.

Notary Public in and for the State of Texas

SANDRA TREVINO
MY COMMISSION EXPIRES
February 10, 2009

4



February 13, 2006

Gary Gage

RE:   Cause No. 4:06-CV-00219; *Trussway, Ltd v. John Wiggs and Construction Resource Service, Inc.,* currently pending in the United States District Court for the Southern District of Texas, Houston Division

Dear Gary:

It is my understanding that you have had conversations with Greg Frey, the Houston Operations Manager for Trussway, that you would like to voluntarily share truthful information with us in exchange for Trussway's decision not to pursue any claims against you in relation to the above referenced lawsuit or any matter related to such lawsuit.

Please be advised that Trussway has no intention of naming you as a defendant in any claim or litigation related to the John Wiggs and Construction Resource Services, Inc. matters so long as you do the following: (1) provide a full and complete statement to Greg Frey and myself, as well as to our attorneys, describing in full your knowledge of John Wiggs, Construction Resource Services, Inc., Chris Wiggs, Chih Wei Yin, Rick Ignelzi, Chris Newhouse, American Truss a/k/a Bayou City Truss, and anyone related to any of the above people/entities; (2) execute an affidavit and share documents with us upon request regarding the above matter and all ancillary matters; (3) cooperate with Trussway and its attorneys as we continue to investigate the above referenced people/entities; and (4) testify truthfully without the need for a subpoena as requested by Trussway and/or its counsel. So long as you perform the above duties, Trussway will not file suit or pursue litigation against you.

We agree to deliver this letter to you in executed form after you have met with Greg and myself and our attorneys to generally discuss these matters. Again, this release is based on you telling us the whole truth and nothing but the truth. Of course, we do not want any false testimony of any kind, whether helpful or harmful to Trussway. We simply want the truth so that we can get to the bottom of this matter as quickly as possible, with minimal legal expense to Trussway, and to fully pursue the true culprits of this wrongdoing.

Very truly yours,

Cris Raines

TRUSSWAY, LTD.                          §    IN THE DISTRICT COURT
                                        §
     Plaintiff                        §
                                        §
vs.                                     §    270th JUDICIAL DISTRICT
                                        §
AJM FRAMERS, INC.                       §
                                        §
     Defendant.                       §    HARRIS COUNTY, TEXAS

## AFFIDAVIT OF RAJU SRIRAMA

STATE OF TEXAS          §
                        §
COUNTY OF HARRIS        §

On this day, Raju Srirama appeared before me, the undersigned notary public, who upon his oath stated the following:

1.      "My name is Raju Srirama. I am more than 21 years of age, of sound mind, and capable of making this affidavit. I have personal knowledge of the facts stated herein and do swear that they are true and correct.

2.      I am a resident of Harris County, Texas.

3.      I am a former employee of Trussway, Ltd. ("Trussway"). In my prior capacity with Trussway I had access to and retained a copy of their proprietary truss design/truss CAD layout software ("Truss Layout") as well as a copy of their software under license from MiTek, Inc ("MiTek") which software is designed to assist in the engineering of individual trusses ("Truss Cut Sheets"). This software was loaded on my personal desktop computer at my house and it is the only software of this kind that I had at my house.

4.      I have maintained personal relationships with many people in the truss industry including other current and former employees of Trussway. In June/July, 2005, one of those

1



**EXHIBIT**

B

former employees of Trussway, John Wiggs ("Wiggs"), contacted me about meeting for lunch, which was not unusual. During the lunch meeting, however, Wiggs advised that he had a project in Houston which required trusses and that he needed some help with the Truss Layout. He asked if I would help. He provided few details and is a very friendly person with a strong personality, and doesn't accept "No" as an answer very easily. While I really did not want to undertake this project, I tentatively agreed to help him.

5.     Wiggs called several more times as the Project moved forward and eventually requested that I provide both the Truss Layouts and the Truss Cut Sheets for a project called, Estates at Greenway Apartments (the "Greenway Project"). Wiggs delivered the construction drawings for the Greenway Project to me, and asked that I do the design/engineering. I told Wiggs I needed someone to give me a license for the design/engineering to create the Truss Layouts and the design/engineering software to create the Truss Cut Sheets. Wiggs told me to contact Rick Ignelzi, but indicated that the work had to be completed quickly. I made several follow-up requests to Wiggs for a license and/or an authorization from someone with a license to use the software. However, Wiggs never did provide a license.

6.     Instead, Wiggs indicated that I talk to Rick Ignelzi ("Ignelzi"). I understood that Ignelzi maintained some sort of a business relationship with Wiggs which involves a company called Construction Resource Services ("CRS"). I knew Ignelzi as another former Trussway employee (in fact, the former president of Trussway), and someone who maintains many industry contacts. Thus, I initially believed that Ignelzi could obtain a license and/or an authorization to use such software, so that I could provide the Truss Layouts and the Truss Cutsheets for the Greenway Project.

2

7.     Ignelzi contacted me several times to encourage me to keep working on the design/engineering, and I requested an authorization and/or a license to use the software for the Greenway Project.  At one point Ignelzi advised that he would get the license from Dan Zimmerman, who is another former Trussway employee and who I understand is now associated with a different truss company owned by his father.  I never talked to Mr. Zimmerman directly about this matter, however; and Mr. Zimmerman never provided an authorization, license, etc.  I have no idea if Mr. Zimmerman had any knowledge of this request; it is simply what I was told by Ignelzi.

8.     During this entire time period I was uneasy about Wiggs' and Ignelzi's request because it did not appear that I was receiving all of the information that I needed, and they continued to be vague about the source of the license and/or authorization to use the software that I needed in order to provide the design/engineering for the Greenway Project. On a couple of occasions I tried to end my involvement, but I was told that time was of essence, I was urged to complete to project and any delay could cause problems.

9.     Finally, I decided that I had been misled about the license and/or authorization to use the software necessary to create the Truss Layouts and the Truss Cut Sheets, so I contacted Wiggs and told him that I was ending my involvement. Finally, Wiggs said to just give him the draft drawings on a CD.  I finally agreed to do so but indicated that such work was only in the form of a "draft" and I made sure that the initials "J.W." for John Wiggs appeared on the layout drawings, not my name.

10.     Before ending my involvement in the project, I was asked to take the draft layouts and truss drawings to Chris Newhouse to enable him to seal them for submittal.  Newhouse was

3

an engineer and former Trussway employee who I understood had permission to use various softwares, though I really did not know any details about his authorizations or licenses. We agreed that Newhouse and I would meet to discuss my work so that I could explain the drafts and tell him that some of the trusses need to be re-run. I also indicated to Newhouse that I believed that there were some errors in the drawings which required clarification and correction in order to finish any Truss Layouts and/or the Truss Cut Sheets. After a couple of weeks, John Wiggs brought the submitted drawings back from SCA/Architect. These had the layouts marked as "Life Time Technologies" and some revisions indicated by SCA. I did not review them in detail since I had stopped any work on the drafts. I also did not want any of my work to be the basis for a final product/output for all of the reasons noted above, as well as the fact that someone needed to make the corrections that were indicated by the Engineer of Record, SCA Engineers, and/or perhaps the architect, in order to correct some of the issues that I had observed regarding the Greenway Project.

11.     I utilized the MiTek software with a standard input of 1.0 duration value. Again, my design/engineering work were merely drafts; and I made it very clear to Wiggs that some corrections and approval were needed on the drawings.

12.     Later, Ignelzi contacted me and again stated that he was very disappointed that I would not finish the work on the Greenway Project. He asked how many hours that I had spent working on the Greenway Project, and I told him. Based on that it is my best recollection that CRS sent me a check for $2,000.00 for my assistance.

13.     I had no further involvement in the Greenway Project until Greg Frey contacted me to advise of the potential dispute with Wiggs, AJM, etc regarding the Greenway Project. I

4

have executed this affidavit as a truthful representation of my knowledge and understanding

(with respect to others) regarding the Greenway Project.

      Further Affiant saith not."

RAJU SRIRAMA

      SWORN TO and SUBSCRIBED before me by RAJU SRIRAMA on the __16__ day of December, 2005.

Notary Public in and for the State of Texas

MICHAEL W. HENRY
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
_____ 11, 2006

5